HAIAAINRA                    Oral Argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: APPLICATION OF
APOSTOLOS MANGOURAS TO CONDUCT
DISCOVERY FOR USE IN A FOREIGN
PROCEEDING PURSUANT TO 28
U.S.C. 1782.,

                Plaintiffs,

        v.                              17 MC 172 (PKC)

HOLLAND & KNIGHT LLP, ET AL.,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 18, 2017
                                        2:00 p.m.

Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge

                        APPEARANCES

TISDALE LAW OFFICES, LLC
     Attorneys for Applicant
BY:  THOMAS L. TISDALE
TIMOTHY J. NAST


SQUIRE PATTON BOGGS (US) LLP (NYC)
     Attorneys for Respondent
BY:  VICTOR GENECIN
ALICE DE JUVIGNY

HAIAAINRA                          Oral Argument

1          THE COURT:  Please be seated.

2          (Case called)

3          MR. TISDALE:  Thomas Tisdale and Timothy Nast, for the

4     applicant, your Honor.

5          THE COURT:  Good afternoon.

6          MR. GENECIN:  Good afternoon, your Honor.

7          Victor Genecin.  I'm here with Alice de Juvigny, for

8     the respondents.  With us at counsel table are Brian Starer

9     Javier Castro Lopez, who is a state attorney for the Government

10    of Spain and Dr. Charles Cushing.

11         THE COURT:  All right.  So you represent all three

12    respondents?

13         MR. GENECIN:  Yes.

14         THE COURT:  Thank you.

15         All right.  The first question I am going to put to

16    both sides, I have your submissions.  Has everyone, has each

17    side put in in terms of a factual presentation legal

18    presentation, everything they wish to put in?

19         Mr. Tisdale.

20         MR. TISDALE:  Thank you, judge.

21         The only thing, there are a few minor a few issues I

22    would respond to in response to the letter that was submitted

23    to your Honor on October the 6th from Mr. Genecin.  So if you

24    like, I can do that now.  If you like, I can do that in a

25    letter.

HAIAAINRA                    Oral Argument

1          THE COURT:  No.  You'll be able to do that today.

2          MR. TISDALE:  Wonderful.

3          THE COURT:  All right.

4          MR. TISDALE:  Other than that, nothing further.

5          THE COURT:  OK.  Mr. Genecin.

6          MR. GENECIN:  Yes, your Honor.  Just briefly, in 2013

7     and today as well, the Spanish government has made a specific

8     request to your Honor to deny the discovery that is sought

9     here.

10         THE COURT:  You said in 2013?

11         MR. GENECIN:  Yes, and again in the proceedings here.

12    So in 2013 --

13         THE COURT:  Well, I'm going to hear from you.  I'm

14    asking you, is there anything you'd wish to put in that you

15    haven't put in?

16         MR. GENECIN:  Yes, there is.  It's on that specific

17    point.

18         THE COURT:  OK.  Go ahead.

19         MR. GENECIN:  It's specifically on the point of the

20    position of the Spanish government that has been made very

21    clear, particularly, in the letter that was sent to your Honor

22    dated August 21, 2017, which is document number 491 from Deputy

23    Director Serrano of the Spanish Ministry of Justice.  And we

24    didn't make this point in our memorandum but we believe that we

25    should present it to you, that your Honor should consider the

HAIAAINRA                         Oral Argument

1    precedence of the Court of Appeals that holds that when a

2    foreign government directly participates in U.S. court

3    proceedings by making a submission regarding the construction

4    and the effect of its laws that is reasonable under the

5    circumstances -- and we suggest that certainly the presentation

6    by Deputy Director Serrano concerning Spanish Secrecy Law

7    concerning the way in which a Querella Criminal is brought in

8    the Spanish courts are directly relevant to the circumstances

9    here and they constitute a statement by the Spanish government

10   for your Honor of the relevant law.

11            Under such circumstances the Second Circuit has held

12   most recently in 2016 in a case called Animal Science Products

13   and that case is reported at 837 F.3d 175.

14            THE COURT:  Give me the cite again please.

15            MR. GENECIN:  Yes.  837 F.3d 175.

16            THE COURT:  OK.

17            MR. GENECIN:  The Court has held that under such

18   circumstances a United States court should defer to the

19   statements of the foreign government.  And I have referenced

20   specifically to language on page 189 of that opinion in which

21   the Second Circuit held not to extend deference in these

22   circumstances disregards and unravels the tradition of

23   according respect to a foreign government's extrication of its

24   own laws, the respect same respect and treatment that we would

25   expect our government to receive in comparable matters before a

HAIAAINRA                          Oral Argument

1    foreign court.

2          And so I would suggest that the decision of the Court

3    of Appeals is a lengthy and carefully reasoned decision citing

4    its earlier precedence on this subject is directly on point

5    here on the issue of whose explanation of the law your Honor

6    should adopt.  And in addition, it's directly on point with

7    respect to the reciprocity concerns that Intel directs district

8    courts to consider in 1782 cases.  So that is one matter of law

9    that we did not bring before your Honor before.

10         Additionally, there are two new cases that have just

11   been decided since our sur-reply memorandum of law went in.

12   The first one is In Re: Schlich, S-C-H-L-I-C-H, decided in this

13   district on the 18th of September.  The cite for that is 2016

14   U.S. District Lexus 170769.  I'm sorry -- actually, yeah,

15   that's right.

16         THE COURT:  What's the date of the decision,

17   September 8?

18         MR. GENECIN:  September 18, 2017.

19         THE COURT:  Who decided that?

20         MR. GENECIN:  Judge Broderick.

21         THE COURT:  All right.  And tell me what the case

22   stands for.

23         MR. GENECIN:  All right.  And that case, your Honor,

24   discusses specifically the issue of the "for use requirement"

25   of 1782 and discusses the question of the requirement that an

HAIAAINRA                          Oral Argument

1    applicant demonstrate that he has some discernible procedural

2    mechanism in the foreign proceedings to establish that he can

3    actually use the materials that he seeks.

4            The second of the cases, your Honor, is In Re:

5    Application of Sergeant.  That was decided by Judge Pauley just

6    a week ago on October 10 of 2017.  The cite for that, your

7    Honor, is 2017 U.S. District Lexus 167248.

8            THE COURT:  The name of the case please.

9            MR. GENECIN:  Yes.  That's In Re: Application

10   Sargeant.

11           THE COURT:  "Sergeant"?

12           MR. GENECIN:  Yes, S-A-R-G-E-A-N-T.

13           THE COURT:  And the date?

14           MR. GENECIN:  October 10th of 2017.

15           THE COURT:  OK.  Go ahead.

16           MR. GENECIN:  And that is a case that discusses the

17   issue again of whether evidence sought is shown to be for use

18   in a proceeding.  And Judge Pauley notes that the Second

19   Circuit has held repeatedly now that the applicant must be in a

20   position to have the foreign tribunal consider the evidence

21   that he seeks or have some means of injecting the evidence into

22   the proceeding if he is to satisfy the 'for use requirement'.

23   Judge Pauley held the 'for use requirement' which is a

24   statutory requirement, not a discretionary one was not met and

25   accordingly dismissed the application.

HAIAAINRA                       Oral Argument

1          So those are new cases that we believe should be

2     brought to your Honor's attention.

3          THE COURT:  All right.  Is there anything else of fact

4     or law that you wish to offer at this time?

5          MR. GENECIN:  Everything else is in our papers, your

6     Honor.

7          THE COURT:  Thank you very much.

8          All right.  Mr. Tisdale, I'll hear from you on your

9     argument on your application.

10         MR. TISDALE:  And if I may, judge, there is an

11    additional case from the Second Circuit which came in after our

12    sur-reply brief came in.  It's called In Re: Accent,

13    A-C-C-E-N-T, Delight 869 F.3d 121.  And it addresses criminal

14    investigations prior to formal accusations being conducted and

15    I think has a direct bearing on the Querella Criminal issue.

16    So that's just one other additional case.

17         THE COURT:  All right.  Thank you.

18         One second please.

19         (Pause)

20         THE COURT:  Go ahead.

21         MR. TISDALE:  Your Honor, do you mind if I stand at

22    the podium?

23         THE COURT:  That would be just fine.

24         MR. TISDALE:  Thank you.

25         If it's acceptable, your Honor, I will address the

1   last submission by the respondents last so it puts, I hope

2   everything by that point is framed in some way.

3            I think it's important in this motion, your Honor, to

4   appreciate that there are two separate applications here.  And

5   when we're talking about both the evidentiary objections and

6   the objections under Section 1782, we need to be clear into

7   which or to which application we are discussing because --

8            THE COURT:  One relates to Cushing and the other

9   relates to Holland & Knight and Squires Sanders.

10           MR. TISDALE:  Correct.  And the Cushing one was never

11  filed previously.  As you well know, the Squire Patton one has

12  a history to it.

13           I think it's important that in reviewing 1782 the

14  Court be reminded of the standard of review that these

15  applications are to be viewed with the twin aims in mind that

16  is to provide an efficient means for the assistance to foreign

17  courts and to encourage foreign courts to do the same with us.

18  Courts are to avoid engaging in detailed analyses of foreign

19  law and that is for the foreign court to carry out.

20           And finally, that it is effectively if in doubt the

21  Court should err on the side of ordering discovery and allow it

22  for the foreign court to decide what to do with it.

23           Spain was involved in litigation here in the United

24  States for over ten years involving ABS.  And in that discovery

25  they obtained ten, many documents, enumerable documents, took

HAIAAINRA                        Oral Argument

1    enumerable depositions.  We are looking for a small piece of

2    that information, judge.  Not all of it, not an exhaustive, not

3    a burdensome task.  We're looking for two bits of information

4    from these proceedings.

5            Let's address the Squire Patton and Boggs application

6    for the moment.  Your Honor will recall when we came here in

7    2013, at the time we filed it, the trial was still ongoing.  By

8    the time that application came before your Honor for a motion

9    to compel, so some six weeks later, we then had the case.  The

10   trial was over.  It was being considered by the district court

11   or by the first instance court.  There was a lot of questions

12   as to whether or not the information could be used or couldn't

13   be used even though the trial was over, whether it would be

14   relevant or considered by the first instance court.  If not,

15   would it be usable on an appeal?  Your Honor, said that for a

16   number of reasons you accepted the mandatory requirements had

17   all been met but that the discretionary requirements were just

18   too much in a state of flux.  You denied the application.

19           One of your comments too was in that case if it was

20   going to be used at the Spanish action for all intents and

21   purposes the respondents, Squire Patton Boggs, were Spain and

22   therefore we had issue with the first discretionary test.  That

23   decision was appealed and the Court of Appeals rendered its

24   decision in July 2014.  And in its decision it said when the

25   opportunity -- first, it affirmed your Honor's analysis of

 1    mandatory requirements and agreed that if the circumstances at

 2    the time they were presented to your Honor, the discretionary,

 3    you were within your discretion to deny the application.  But

 4    because the pleadings were in a state of flux, if the applicant

 5    wished to come back to seek that discovery again, they could

 6    make that application again and the issue for the Court to

 7    consider would be the fourth Intel discretionary factor,

 8    whether or not the request was --

 9         THE COURT:  I think you said this but maybe I didn't

10    hear you correctly but I ruled that the law firm was not

11    entitled to Spain's sovereign immunity.

12         MR. TISDALE:  Correct.  You agreed that when it came

13    to the mandatory factors that were not the same as Spain.  They

14    were not entitled to immunity, you are correct.  When it came

15    to the discretionary factors and seeking discovery from a party

16    in the foreign proceedings and in that instance following a

17    case involving Proskauer you said for all intents and purposes,

18    they are one and the same because it was going to be used in an

19    action involving Spain.  But the Court of Appeals' decision

20    orders that if the appropriate circumstances arise we can

21    refile and the issue to be resolved would be the fourth Intel

22    factor.

23         Judge, I don't know how that should be handled.  I

24    don't know what should be done with the restrictive order of

25    the Second Circuit.  I believe it has meaning.  I believe it

HAIAAINRA                    Oral Argument

1   has clear and plain meaning.  I'm more than prepared to discuss

2   all the other factors but I do believe that this Court has to

3   give consideration to the order of that court.  We have

4   repeated or we have renewed the application in an instance

5   where the appropriate circumstances have now arisen.

6          THE COURT:  You've filed and application under the

7   same docket number, is what you did.  It's a new application.

8          MR. TISDALE:  It's a new application, correct.

9          THE COURT:  Well --

10         MR. TISDALE:  There wasn't a way to file it under the

11  old one.

12         THE COURT:  That's a significant point.  If your point

13  is that somehow this Court's hands are tied or that what I held

14  in 2013 affirmed by the circuit somehow controls this case,

15  certainly, it's controlling precedent because it was affirmed

16  by the circuit perhaps but it's not a ruling binding this

17  application.

18         MR. TISDALE:  OK.

19         THE COURT:  And if it were, that would not be a good

20  thing for you, I suppose.

21         MR. TISDALE:  Judge, I think it would be fine for me

22  given the circumstances.

23         THE COURT:  But anyway.

24         MR. TISDALE:  But let me look at the mandatory

25  requirements of 1782 have been met in both applications.  First

1    of all, in the Squire Patton Boggs application it's evidenced

2    in the district.  Squire Patton Boggs is in the district.  They

3    are -- I'm going to go to the third one saying Mangouras is an

4    interested party in the foreign proceedings.  He is proceeding

5    with the Querella Criminal, and he is going to proceed with the

6    Querella Criminal depending on what the evidence shows or he

7    will use it in the European Court of Human Rights.  But he has

8    already initiated an action in the European Court of Human

9    Rights.

10             THE COURT:  And that's before a single judge at the

11   moment?

12             MR. TISDALE:  As I understand it, yes.

13             THE COURT: Right.  OK.  Go ahead.

14             MR. TISDALE:  So all of the mandatory factors have

15   been established.  Insofar as Cushing is concerned, the same

16   thing exists.  Dr. Cushing is located here in New York.  The

17   evidence is here in New York.  It's to be used in the European

18   Court of Human Rights in an application filed by Captain

19   Mangouras and he is an interested party.  All of the mandatory

20   requirements are established.

21             THE COURT:  What do you hope to learn from

22   Dr. Cushing?

23             MR. TISDALE:  Let me put it in perspective what it is

24   we're talking about and how this all occurred.  In 2003

25   Dr. Cushing participated in remote operated vehicle inspections

1    of the sunken wreck.

2                 THE COURT:  So these are the pictures on the 24 DVDs

3    that you didn't get until the middle of the trial; is that what

4    this is?

5                 MR. TISDALE:  No.  It's the actual data of what they

6    were doing at the time.  They were taking measurements of the

7    ship.  They took various measurements throughout the ship.

8    They took, there's some reference to the fact that they drilled

9    holes to make measurements in the ship.  We never got any of

10   that evidence ever.

11                What happened with the DVDs was they were ordered in

12   2003 to produce to the Court any evidence they got that had to

13   do with the structure of the vessel.  Before the trial they had

14   produced 24 DVDs.  At the trial, ten years later they handed us

15   121 DVDs.

16                THE COURT:  I see.

17                MR. TISDALE:  In February 2013 ten years after the

18   order, we got 121 DVDs involving two different vessels'

19   inspections of the sunken wreck in 2003.  It's not the DVDs

20   that we want.  It's the evidence of what they were doing while

21   they were there which was ultrasonic agent, which was drilling,

22   any other measurements they took of the sunken wreck because

23   they're going to be strong evidence of the structural condition

24   of the vessel in its sunken condition which is only a year

25   after it sank.

1      THE COURT:  Did anyone from the Cushing operation

2  testify in the trial?

3      MR. TISDALE:  Yes.

4      THE COURT:  Who was that?

5      MR. TISDALE:  Dr. Cushing.

6      THE COURT:  OK.

7      MR. TISDALE:  Now, what we're being -- so the evidence

8  is here.  Dr. Cushing is within jurisdiction.  All the

9  mandatory requirements are established by that.

10      Let me go to the issue of 'for use' in the foreign

11  litigation.  The foreign litigation that exists presently is

12  the European Court of Human Rights.  And if I may, your Honor,

13  I would like to submit for your in camera review the Captain

14  Mangouras' application to the European Court of Human Rights.

15      THE COURT:  Now you can't.  You could have before but

16  that was the reason I asked the question before this argument

17  commenced.  I know you referred to it in your papers.  You

18  said, If you want to review it in camera, I can make it

19  available to you.  That's what you said.  That's why at the

20  beginning of this proceeding, it's your application.  It's the

21  respondent's response and I'm not going to do this on the fly

22  such that in the middle of your presentation or in the middle

23  of respondent's presentation, I am going to ask somebody a

24  question and they're going to say, Well, your Honor, in light

25  of your question, I now want to do this, that or the other

1  thing.

2      So your application is denied.  I'm not going to

3  review it in camera.

4      MR. TISDALE:  OK.  Well, as has been stated in various

5  affidavits including the affidavits of Mr. Docampo, the lack of

6  that information from Dr. Cushing's visits to the vessel are

7  part of the application to the European Court of Human Rights

8  on the basis that it was a lack of equality of arms.  We were

9  missing a substantial portion of evidence which could be

10  relevant to those proceedings.

11      THE COURT:  This is Article VI Fair Trial denial you

12  claim.

13      MR. TISDALE:  Correct.

14      THE COURT:  Got it.

15      MR. TISDALE:  When we go to the question of the Squire

16  Patton Boggs, it's for use in the Querella Criminal or in the

17  European Court of Human Rights and the way that's going to work

18  out.  To be the Querella Criminal, the testifying witnesses

19  have to have knowingly given false evidence in Spain.  So the

20  evidence we're seeking will assist us in determining whether or

21  not these individuals knew that what they were testifying to in

22  Spain was in fact false.

23      THE COURT:  I thought your expert said that it didn't

24  have to be knowing.  It could be reckless contempt of the

25  truth.

HAIAAINRA                          Oral Argument

1         MR. TISDALE:  That is the second part also, judge,

2    yes.

3         THE COURT:  OK.

4         MR. TISDALE:  But how do we determine that?  And we

5    determine that by knowing how this was prepared.  In a Querella

6    Criminal we cannot force the witnesses themselves, the

7    defendants, to testify.  So this evidence has to be established

8    through third party discovery.

9         THE COURT:  Right.

10        MR. TISDALE:  The third party discovery is going to

11   help us determine whether or not these individuals knew what

12   they were testifying to was false or whether they might have

13   been shown, for instance, in the instance of Mr. Thuesen,

14   pictures which weren't in fact representative of the vessel at

15   the time he was advised they were taken.  There were

16   photographs taken before the vessel went into dry dock for

17   significant repair right before she sank.  Were those the

18   photographs that Mr. Thuesen was shown?  In which case did he

19   base it on false evidence or was he shown proper, shown other

20   photographs?  Those are the issues we seek to find out.  If he

21   was shown --

22        THE COURT:  This is the captain of the pilot vessel.

23        MR. TISDALE:  That's correct.  He was the pilot who

24   took it through portions of North sea.  If he was shown false

25   evidence that may become part of the European Court of Human

1    Rights' submission.  If he testified falsely knowing he was

2    testifying falsely or recklessly testifying about it, then we

3    have a Querella Criminal against him.  But the evidence we're

4    seeking for the Querella Criminal portion or the European Court

5    of Human Rights is necessary for us to understand what the

6    witnesses knew or didn't know at the time so that we can frame

7    and support the proper application.

8           The case I pointed your Honor to, the Accent decision

9    speaks about using evidence for investigating a criminal

10   action.  In addition, if your Honor looks at the Mees decision

11   which is the Second Circuit --

12          THE COURT:  Yes.

13          MR. TISDALE:  -- 2015, Mees was the court reversed

14   Judge Preska's denial of the 1782 application on the 'for use'

15   test.  And the evidence was that the attorney required the

16   evidence in order to investigate so that she could draft her

17   pleadings and support a claim for defamation.

18          Well, no greater parallel exists than us having that

19   information to investigate support to properly plead and

20   support a Querella Criminal which is effectively a criminal

21   defamation case.  The parallels are present.

22          Questions have been raised a number of times about

23   whether or not we have been able to show that we could clearly

24   use this evidence and have it admitted in trial.  Well, the

25   fact is that's not the test.  The test does not require that it

1    be admissible in evidence.  The Mees decision, the Intel

2    decision all address that fact.  Will the information from the

3    evidence make its way -- you know, is it reasonable that that

4    evidence or the information from that evidence will be used in

5    that case to support the applicant's position?  If so, that's

6    all that's required.

7        Now, looking at the discretionary factors, the first

8    discretionary factor being is this discovery or party?  In no

9    instance are either one of these parties to the proposed

10   foreign proceeding.  Dr. Cushing is not Spain.  Spain is the

11   party in the European Court in the Human Rights submission.

12       Insofar as the Querella Criminal is concerned, the

13   parties are the three nonparty witnesses.  The witness have no

14   association with Spain other than the fact that they testified

15   on their behalf at trial.  They are not parties to that case.

16       So we no longer have the question of whether or not

17   Squire Patton and Boggs was for all intents and purposes,

18   Spain.  Spain is not a party to that Querella Criminal.  They

19   are the three nonparty witnesses.

20       THE COURT:  But they are to the European Court of

21   Human Rights?

22       MR. TISDALE:  They are a party to the European Court

23   of Human Rights.

24       The second discretionary factor whether or not the

25   forum effectively will be receptive, there is no statutory

1    basis that the evidence must be admitted in the foreign

2    proceedings.  But your Honor has before you various affidavits

3    from Spanish counsel indicating that both in the European Court

4    of Human Rights and in the Querella Criminal, this evidence or

5    the information from this evidence will be used to support

6    Captain Mangouras' position.

7           In the Querella Criminal it will be used in the

8    preparation and to support it in order to get the public

9    prosecutor to then prosecute it.  If we make a weak application

10   the chances of it being prosecuted drop dramatically.

11          THE COURT:  So the Querella Criminal is you sit down

12   with the prosecutor and show what you have and then the

13   prosecutor makes the decision whether to proceed with the

14   prosecution.  And if it's brought, it's brought in the name of

15   whatever the prosecuting authority is, whether it's the kingdom

16   or some other person or entity.

17          MR. TISDALE:  I don't believe that's entirely correct,

18   judge.

19          THE COURT:  All right.  Well, help me out with that.

20          MR. TISDALE:  The individual prepares a pleading which

21   he presents to the public prosecutor which he submits evidence

22   to support his case.  If the public prosecutor wishes to

23   proceed, he then investigates and pursues it along with the

24   applicant.  The applicant is a direct party in the Querella

25   Criminal unlike the other type of criminal investigation where

1    you are a complainant.  This is a quasi criminal application so

2    that it's not just the victim but you are a participant in

3    litigation.  You have a right to submit evidence.  You have the

4    right to pursue information on your own behalf, much the same

5    as the applicant in the Mees case.

6              THE COURT:  All right.  But you have to be

7    green-lighted by prosecutor before the case goes forward?

8              MR. TISDALE:  That's my understanding.

9              THE COURT:  OK.

10             MR. TISDALE:  We've talked about the foreign proof

11   gathering.  The third discretionary factor is avoiding foreign

12   proof gathering restrictions?  No, there is nothing here that

13   is in any way affecting foreign proof gathering.

14             You've heard throughout a lot of argument that we

15   should have done this during the trial of 2013.  We should have

16   done that during the trial of 2013.  Those arguments may have

17   been relevant to the application we made in 2013.  But they are

18   no longer relevant to the applications you have before your

19   Honor.  That information and what happened in the Spanish

20   action is entirely independent of what is happening here.  They

21   are dot lined connected.  But in no case has anybody said what

22   you didn't do in an unrelated litigation is going to hold you

23   or restrict your application if you're seeking discovery for

24   use in a different action.

25             Now, if for instance there's an argument that we

HAIAAINRA                    Oral Argument

1   should have sought from Dr. Cushing this information during the

2   four months we have left of the trial, even though they'd

3   avoided the order for ten years which is an argument I think

4   has the absolute --

5          THE COURT:  What order?  "They'd avoided the order for

6   ten years".  What order?

7          MR. TISDALE:  There was an order issued in 2003 by the

8   Spanish court that all evidence relating to the vessel's

9   structure be produced to the court and all parties.

10         THE COURT:  I see.  I read about that I recall, yes.

11         MR. TISDALE:  So for the ten years that followed, that

12   was avoided.  It still hasn't been produce to this date that we

13   didn't do anything in the four weeks is or four months that

14   followed after we gleaned the concept that they did in fact

15   take measurements, is not relevant to this application.  That's

16   up to the European Court of Human Rights to decide whether we

17   should have or should not have done something during that

18   trial.  I don't think it's appropriate for this Court to weigh

19   that issue, what we could or could not have done.

20             What I can say from a practical point of view is that

21   you're looking to assimilate information that takes a long time

22   to analyze, digest, determine what it's value is where exactly,

23   what exactly this information shows you, where on the ship

24   we're talking about and all these other factors that it's not

25   something you do in four months at all.  But that issue is a

1    nonissue.  That's for the European Court of Human Rights to

2    decide.

3              Now, there have been raised issues about privilege

4    both on the Spanish law and U.S. law.  When it comes to issue

5    of privilege, that's not my burden to prove.  That's the

6    respondent's burden to prove that these documents are somehow

7    other protected by privilege.  The first question is which

8    privilege?  And the rules of comity would establish that the

9    evidence we're seeking is not protected by any Spanish

10   privilege.  Based upon a Second Circuit's -- I think I referred

11   to as a "touch base analysis", you effectively look to see what

12   was that evidence gathered for.  What was it being used to do?

13             Well, when it comes to Squire Patton Boggs

14   application, that was evidence that they were preparing and

15   using here in New York for their litigation with ABS.  Each of

16   the declarations is signed by the witness under penalty of

17   perjury of the laws of the United States and was used in the

18   ABS litigation.  That's what it was gathered for.  That's the

19   method by which it was pulled together, only U.S.

20             THE COURT:  That goes to Captain Kostazos'

21   declaration?

22             MR. TISDALE:  That would go both to Captain Kostazos,

23   Mr. Alevizos, who issued an expert report here in the United

24   States and to Mr. Thuesen who prepared a declaration also for

25   use here in the United States.  And all of that evidence in

HAIAAINRA                    Oral Argument

1    some form or other was used or exchanged in the ABS litigation

2    here in New York.

3        THE COURT:  When did the ABS litigation terminate,

4    approximately?

5        MR. TISDALE:  I believe 2010 at the district court.

6    2012 at the Court of Appeals.

7        THE COURT:  Well, let's take in the district court for

8    the moment.  Is any of what you will seeking by way of

9    subpoena, does any of what you're seeking by way of subpoena of

10    the two law firms postdate the termination of the ABS

11    litigation in the district court?

12        MR. TISDALE:  Nothing we seek postdates that

13    litigation.

14        THE COURT:  OK.

15        MR. TISDALE:  Spanish privilege doesn't apply.  Plus

16    or unless your Honor has significant expert evidence on what is

17    covered by Spanish privilege, I think we've more than clearly

18    established that Spanish privilege does not cover the types of

19    information we're seeking in what I think are pretty

20    restrictive subpoenas.

21        THE COURT:  Now, I don't know whether this is where

22    you're headed next but I want to make sure you address this.

23    Well, for one thing I want to hear about the Cushing subpoena

24    but then the other thing I need to hear about as to the two law

25    firm respondents when they get up here and they say drafts and

1    the like were attorney work product in the ABS litigation and I

2    understand your position is that there is the type of

3    particularized need and the showing of need that would overcome

4    a claim of work product.

5            First of all, do you urge that it's not work product

6    or do you concede it's work product and urge that there is a

7    need or both?

8            MR. TISDALE:  Number one, I would urge your Honor that

9    there is a vast amount of document, there's a vast amount of

10   information which is not subject to attorney work product

11   privilege.  And if you look at the objections that were raised

12   by Squire Patton Boggs they indicate that they have analyzed

13   and restrict, taken their hard copy documents and found that

14   there are 1200 pages, 300 documents making up 1200 pages that

15   would be responsive and of those 300 documents only 104 are

16   claimed privilege.

17           THE COURT:  Well, you say privileged or work

18   product --

19           MR. TISDALE:  Either privileged.

20           THE COURT:  Is the attorney/client privilege asserted

21   as to any of the documents?

22           MR. TISDALE:  I don't know because I haven't seen the

23   log.  They have not produced for me yet the log that they

24   prepared in 2013.  So I can talk in a vacuum but I have no

25   specific information.  When it comes to the hard documents from

HAIAAINRA                    Oral Argument

1    Squire Patton Boggs there are 1200 pages.  It's a little bit

2    more than a bankers box of documents.  It's not terribly

3    onerous.  It's already pulled apart.  Of that they claim

4    there's privilege to about a third of it.  Well, I believe that

5    the task is already done on those documents that are to which

6    they claim no privilege, they should be produced.

7            As to the ones that they do claim privilege we should

8    as your Honor had suggested in 2013, the privilege log should

9    be exchanged.  We should be able to identify specific documents

10   for your Honor's in camera review and we can then address the

11   specific issues as to whether or not any of these had any work

12   product privilege whether or not that work product privilege

13   can be overcome because of need, necessity, no other way of

14   gaining the information or some other exception but I can't do

15   it in a vacuum.

16           And the document's already been prepared.  It was

17   prepared in 2013.  It should have been produced long ago.  Many

18   cases in this Court have established that omnibus objections to

19   notices to produce and failure provide a privilege log is

20   itself a waiver of any work product privilege.

21           THE COURT:  It's right in the local civil rules.  It's

22   a requirement in this district.

23           MR. TISDALE:  Yes.  We've still never gotten one for

24   either.  Now, that's Squire Patton Boggs.  I can't emergency

25   imagine with the exception of the rare communication between

1    counsel and Dr. Cushing --

2              THE COURT:  Well, what about Holland & Knight, how do

3    they figure into this?

4              MR. TISDALE:  Holland & Knight is where Mr. Starer

5    began.  So this case, the ABS litigation was run by Holland &

6    Knight up until sometime, best recollection 2007/8, something

7    like that.  Mr. Starer would know better.  But he left Holland

8    & Knight, went to Squire Patton & Boggs during the ABS

9    litigation at some phase.  So your question was, does Holland &

10   Knight have anything in their control which would be responsive

11   to these requests?  I don't know what documents or what

12   information was left where for what purposes, et cetera.

13             So we've agreed with Holland & Knight that this whole

14   thing was by the event.  We'll see what information we get from

15   Squire Patton and Boggs and then if we need to we'll have

16   further discussion as to what they might do down the road to

17   obtain additional information that might not be available to

18   Squire Patton Boggs.

19             Now, again, with the Cushing production nothing has

20   been produced.  I cannot imagine much of anything to which

21   privilege under U.S. law could be claimed for that information

22   which is very specific relating to those instances where he was

23   working with specific remote operated vehicles.

24             THE COURT:  All right.  Now, you need to explain this

25   to me with regard to the Cushing work, it was done at or about

HAIAAINRA                    Oral Argument

1    the time of the events 2002 or a year or so, within a year of

2    that --

3              MR. TISDALE:  Correct.

4              THE COURT:  -- for what purpose.

5              MR. TISDALE:  I believe Dr. Cushing's affidavit

6    indicates that he was doing that to determine whether or not

7    the --

8              THE COURT:  I guess this is what I'm asking is, does

9    his work tie into the ABS litigation or is it separate from the

10   ABS litigation?

11             MR. TISDALE:  I believe it ties into.  If it had been

12   favorable it would have tied into the ABS litigation.  I

13   believe his declaration says something to that effect.  OK?

14   Dr. Cushing submitted a two-page declaration and I don't have

15   it handy.

16             Now, let me just address a couple of things raised in

17   that most recent letter from Squire Patton and Boggs.  I've

18   already discussed the volume of information which was withheld

19   during the course of the trial and I discussed the fact that if

20   there is any question about whether we should have taken action

21   during the trial to get that additional evidence or not, that

22   would be something for the European Court of Human Rights to

23   decide but it should not be something that comes into this

24   Court's analysis.  The Court of Human Rights should have that

25   information and they should then decided what to do with it.

HAIAAINRA                        Oral Argument

1           There was a statement made that somewhere in

2      August 2013, the applicants from actually abandoning the

3      thought of using the evidence in the Spanish action.   And

4      there's reference to different declaration as what might be

5      missing in the declaration, et cetera.   That's just not so.

6      That's just not the case.   In 2013 when we were here before

7      your Honor we were clearly looking to use it if we could in the

8      Spanish proceedings in some way.   If that evidence was relevant

9      to that case and the declaration of Ruiz Soroa which we

10     submitted on August 27, 2013, specifically, speaks to that

11     point.   So any inference that somehow or other we were giving

12     that up is not so.

13          THE COURT:   But we did refer to a possible Querella

14     complaint and also to the European Court of Human Rights is my

15     recollection.   I say recollection of what I found out when I

16     looked at the record of the 2013 case, not to suggest that I

17     remembered it from 2013.   I certainly didn't.

18          MR. TISDALE:   You are exactly right, your Honor.   When

19     the trial ended we were arguing in addition to the fact that we

20     could be using, we would be trying to use it in a Spanish

21     action or in an appeal in the Spanish action.   But there was

22     also at that point considerations that depending on how it all

23     worked out there would be a Querella Criminal against these

24     three witnesses or once all of the actions were completed in a

25     claim in a suit in the European Court of Human Rights but you

HAIAAINRA                    Oral Argument

 1    have to exhaust all of your remedies before you can go to the

 2    European Court of Human Rights.

 3            Now just on that point, when we filed this both these

 4    applications in May and June of this year, so four or five

 5    months ago we were at a point which I believe was exactly what

 6    the Court of Appeals was telling us, the appropriate

 7    circumstances, we had exhausted all of our other possible ways

 8    of overturning the conviction of Captain Mangouras.  He had won

 9    at the lower court the court of first instance.  He was

10    exonerated of the serious crimes.

11            THE COURT:  And that was not, that had not yet

12    happened in 2013?

13            MR. TISDALE:  Correct.  When it was before your Honor

14    it hadn't happened.

15            THE COURT:  The trial had just finished.

16            MR. TISDALE:  While it was on appeal it did happen,

17    right?

18            THE COURT:  Right.

19            MR. TISDALE:  In January of 2016, so more than two

20    years later, the Supreme Court in an unconstitutional way

21    overturned the facts and convicted him of the crimes against

22    the environment, the serious crimes that he faced.  That

23    decision in January of 2016 was then a -- application was

24    filed.  That was denied.  And then an appeal to the

25    constitutional court was taken and that wasn't denied until

March of 2017.

Now it's in March of 2017 where my recommendation was now the circumstances are appropriate, as the Court of Appeals had said.  When the circumstances are appropriate, refile your application.  The only options Captain Mangouras had at that time was Querella Criminal and the European Court of Human Rights actions.  That's it.  There is no where else he can go. There is no question about can we use it on appeal?  Can we use it in constitutional court?  Can we use it any place else? There is no place else for us to use it.  There is no place for Captain Mangouras to go.  But all of this evidence is very relevant to both of those cases or to the one case and the one application.

Now, I was misstating something in my letter of October 2.  I should have said that when the Court of Appeals decision was rendered in July 2014 that at that time we decided we were going to wait until the circumstances became appropriate, not when Captain Mangouras was acquitted in November 2013 because at that point he is still pretty fired up.  But we couldn't do anything because your Honor denied our application.  The Court of Appeals hadn't heard it yet.  But I did make a comment in the Court of Appeals motion to expedite the briefing that he was considering the Querella Criminal and that we wanted to move this thing forward as quickly as we could.

1        When I wrote my letter of October 2 I was working

2   remotely.  I had forgotten that fact.  But it was as of the

3   July 2014 decision of the Court of Appeals when they said the

4   information is going to be retained.  It's not going anywhere.

5   It's going to stay with Squire Patton & Boggs for five years.

6   So I was assured the evidence would still remain there.  But it

7   was certainly after all that we had gone through before your

8   Honor and the Court of Appeals, my strong recommendation that

9   we'd waited until the appropriate circumstances were clear.

10  And in this particular case the appropriate circumstances

11  weren't clear until the constitutional court said "no more".

12  They rejected it and we had nothing left but the Querella

13  Criminal and the European Court of Human Rights submission.

14       But Mr. Serrano has submitted another letter to your

15  Honor as part of this October 6th submission from Squire

16  Patton.  And I have to say, judge, that if it is that, if it is

17  his evidence you are supposed to give great deference to, well,

18  I would submit to your Honor that there's a great deal of

19  candor lacking in that letter.  In his letter he talks about

20  the fact that he believes that, he's alluding to the fact, to a

21  belief that we're seeking to use this information actually for

22  the London PNI Club, not for Captain Mangouras.

23       Now, I still don't to this day understand how evidence

24  about how Captain Kostazos or evidence for the Querella

25  Criminal or the European Court of Human Rights is in any way

 1   going to be usable by the London PNI Club in any action.  I

 2   will tell your Honor I have never been asked or directed to

 3   assist the London PNI Club as a party in any litigation

 4   relating to the Prestige.  I am, we are one of 35

 5   correspondents they have in the United States.  I do work with

 6   them from time to time.  This is a fact well-known to

 7   Mr. Starer.  In 2003 he contacted me to ask us if I could

 8   convince the club to participate in the ABS litigation on

 9   behalf of the owners.

10        In 2004 he subpoenaed me because I had represented

11   Maury Shipping in a Rule B attachment.  He thought perhaps I

12   had evidence relating to Prestige that would be good for the

13   ABS case.  My involvement with the London Club has never been

14   any secret.  But in this case in the Prestige entirely, I have

15   never been asked to represent them as a party in way, shape or

16   form in this court or anywhere else.

17        THE COURT:  Well, I assume that there are some

18   insurers who would benefit if the criminal conviction were

19   vacated.

20        MR. TISDALE:  I don't know.  The European court --

21        THE COURT:  You may not know, sir, but I would assume

22   either the owner of the vessel and/or the insurer of the vessel

23   would benefit if the criminal conviction were vacated.

24        MR. TISDALE:  Let me go further, your Honor, because

25   what Mr. Serrano doesn't tell you is that Spain was a party to

HAIAAINRA                    Oral Argument

1    a litigation with the club in London relating to whether or not

2    the London club had any responsibility under its policy for any

3    of the liabilities for which Spain was seeking in the Spanish

4    action and Spain participated in the high court and the Court

5    of Appeal and Spain lost that there is a declaratory judgment

6    from the English Court of Appeal that establishes that the

7    London club has no direct liability to Spain, that the

8    indemnity obligations are all they're responsible for and there

9    are other decisions part and parcels to it.

10           When Mr. Serrano talks about the club using this

11   evidence somehow or other to avoid the first instance court's

12   judgment in Spain without having told your Honor about actually

13   the history of the litigation that Spain was involved in --

14           THE COURT:  Well, he maintains that the Supreme Court

15   further found that Mr. Mangouras and the London Steamship

16   Owners Mutual Insurance Association, the London PNI Club

17   liable, civilly liable, was the London PNI club found civilly

18   liable by the Supreme Court of Spain?

19           MR. TISDALE:  It was.  And it was also found to be not

20   liable by the English Court of Appeal.

21           Now, if you are making an allegation such as

22   Mr. Serrano is, that would have been evidence that I think this

23   Court should have been made aware of.  Certainly, all the

24   attorneys in this room are aware of it because it was printed

25   and discussed in trade wigs.

1          THE COURT:  You are talking about the UK litigation?

2          MR. TISDALE:  Correct.

3          THE COURT:  Well, Mr. Serrano is the Deputy Director

4    of Litigation for the Spanish government?

5          MR. TISDALE:  Correct.

6          THE COURT:  OK.

7          MR. TISDALE:  He would have and should have been very

8    aware of the English litigation in which he participated.

9          THE COURT:  Well, did he?

10         MR. TISDALE:  Well, he directed counsel.

11         THE COURT:  He did?  OK.

12         MR. TISDALE:  As I understand, absolutely.  Yes, they

13   have counsel for Spain and France in fact.

14         THE COURT:  And what about in connection with the case

15   against Captain Mangouras?

16         MR. TISDALE:  Which --

17         THE COURT:  Was he deputy director -- was he involved

18   at all in that?

19         MR. TISDALE:  I believe he was.  I believe he was

20   responsible for directing that litigation in Spain.

21         THE COURT:  All right.

22         MR. TISDALE:  All right.  Your Honor, unless you have

23   any specific questions at this time --

24         THE COURT:  It's your application, so I will hear from

25   the respondents and then I'll give you an opportunity to reply.

HAIAAINRA                        Oral Argument

1          MR. TISDALE:  Thank you.

2          THE COURT:  Go ahead.

3          MR. GENECIN:  Thank you, your Honor.

4          Your Honor, the Spanish government has made clear its

5  opposition to the discovery as it did in 2013.  I would note

6  just for purposes of clarity that the Deputy Director for

7  Litigation for the Spanish state back in 2013 was Fernando

8  Irazumo who wrote to your Honor at that time noting the

9  problems with the application from the point of view of the

10  Spanish government.  Dr. Luis Serrano is the successor in that

11  role.  Dr. Serrano, as I understand it, was not directly

12  involved in the litigation concerning the Prestige that

13  resulted in the judgment of 2013.  He is, of course, now in

14  charge of litigation for the Spanish state.

15          I want to emphasize for your Honor the case that your

16  Honor cited in 2013 which continues to be the very posit here

17  and that's Schmitt which is a case in which the Second Circuit

18  affirmed the district court when it held that a request for

19  discovery in the face of an opposition by authorities from the

20  nation in whose courts the discovery is going to be used, that

21  such discovery would not advance the twin aims of 1782.

22          THE COURT:  Yes.  Well, this ties in with In Re:

23  Vitamin, doesn't it?

24          MR. GENECIN:  Absolutely, it does.  In Re: Vitamin

25  ties in with that.

1          THE COURT:  And that's a case that has nothing at all

2    to do with 1782, correct?

3          MR. GENECIN:  Which case are we talking about now?

4    I'm sorry.

5          THE COURT:  In Re: Vitamin.

6          MR. GENECIN:  Oh, yes.  The Animal Science, that's

7    correct, your Honor.  It's not a 1782 case.

8          THE COURT:  And that was a case where the Chinese

9    government had no stake in the outcome of the case, correct?

10          MR. GENECIN:  That is correct.  However, your Honor,

11    in that case the Second Circuit cites its earlier precedent and

12    I will have that case for you in just a moment.  The early

13    precedent of the Second Circuit is Karaha, K-A-R-A-H-A, Bodas,

14    B-O-D-A-S company and that is 13 F.3d at 70.  And that is a

15    case in which the Indonesian government which was a party was

16    before the court and expressed its view.  And the court said

17    that the view of the government of the foreign country was

18    entitled to deference even though the foreign country was a

19    party.

20          THE COURT:  The issue is In Re: Vitamin C Antitrust

21    litigation was whether or not there could be compliance with

22    both the U.S. law and the Chinese law, wasn't it?

23          MR. GENECIN:  That is true.

24          THE COURT:  That's not present here.

25          MR. GENECIN:  Actually, it is, your Honor.  It is in

1   the sense that Mr. Tisdale has argued to your Honor that the

2   only issue before you is the issue of U.S. privilege and U.S.

3   work product.  When in fact the issue of Spanish professional

4   secrecy is also very much in this case and the Spanish

5   government is very concerned about the violation of its

6   professional secrecy.

7           THE COURT:  Well I've read the letter that was

8   submitted by the Deputy Director of Litigation and I've read

9   the statutory cites and case law cited in the expert's

10  declaration, none of which is cited by the Deputy Director of

11  Litigation.

12          MR. GENECIN:  Well, the deputy director has made the

13  position of Spanish state clear and he does cite cases.

14          THE COURT:  But let's take a look at vitamin C, the

15  case that you asked me to look at and I've read now.

16          MR. GENECIN:  Yes, your Honor.

17          THE COURT:  There wasn't a submission by a party in

18  the case.

19          MR. GENECIN:  Vitamin C was not, your Honor, that's

20  absolutely not.  It was a submission by the Chinese government.

21          THE COURT:  It was, the Court of Appeals took great

22  pains to note that it was sent through official diplomatic

23  channel and it was stating the position of the People's

24  Republic of China on whether there was a conflict between

25  China's regulatory scheme and the U.S. Antitrust laws such that

HAIAAINRA                          Oral Argument

1     the defendant's legal obligations could not, he could not

2     comply with both.  And therefore, the Court reversed.  It's

3     quite a different situation than the direct beneficiary, if not

4     the persons who are alleged to have been associated with and

5     condoned the conduct are the ones who are asserting a position

6     of law in this case.

7              MR. GENECIN:  Well, your Honor, the Spanish state

8     though has taken through the deputy director a clear position

9     concerning Spanish Professional Secrecy.

10             THE COURT:  Absolutely.  And I have reviewed the

11    position taken and it is entitled to consideration and analysis

12    by this Court.  But if and to the extent your position is that

13    it is controlling, you haven't given me any support for that.

14             MR. GENECIN:  Your Honor, I have not suggested that it

15    is controlling.  I have suggested that it is entitled to the

16    Court's deference and I would suggest also that the opinions

17    expressed by our expert Professor Ortiz which support the views

18    expressed on behalf of the Spanish state, clearly demonstrate

19    that we have the better of the position.

20             THE COURT:  Really?

21             MR. GENECIN:  On Spanish law, your Honor.

22             THE COURT:  Oh, really?  How do you get to that

23    conclusion?  Tell me how do you compare the two declarations?

24    I want to hear this.

25             MR. GENECIN:  The two declarations of Professor Ortiz

1    and of Dr. Serrano.

2            THE COURT:  No.  There is no declaration from

3    Dr. Serrano, is there?

4            MR. GENECIN:  Well, Dr. Serrano has submitted a letter

5    to your Honor and has explained in his letter that in his

6    capacity as --

7            THE COURT:  No.  When I said "two declarations", I

8    don't think that's a declaration, is it?

9            MR. GENECIN:  OK.  So I'm sorry.  Which of the

10   declarations are you -- are you concerned about the Ruiz

11   declaration, the final declaration submitted by counsel for --

12           THE COURT:  Maria Jose Rodriguez Docampo.

13           MR. GENECIN:  Yes.  So, your Honor has a series of

14   declarations by Ms. Rodriguez Docampo.  Not one of them cites

15   any authority for any proposition until the final one.  And in

16   the final one Ms. Rodriguez Docampo lays out a series of

17   positions about Spanish law and every one of those positions is

18   rebutted in the discussion that is presented by Professor

19   Ortiz.

20           THE COURT:  OK.

21           MR. GENECIN:  And Professor Ortiz makes very clear

22   that the view that Ms. Docampo takes of Spanish Secrecy law is

23   highly limited in a way the Spanish Secrecy law is in fact not.

24           THE COURT:  Which of the declarations discusses the

25   choice of law analysis as to work product generated in the AMS

HAIAAINRA                          Oral Argument

1    action?

2           MR. GENECIN:  Neither of the declarations discusses

3    the Choice Of Law analysis, your Honor, The Choice of Law issue

4    is one that has been brought into the picture in argument by

5    Mr. Tisdale because the Choice of Law issue is an issue that he

6    is putting before your Honor and what he is saying --

7           THE COURT:  Well, is there not a Choice of Law issue

8    in this case?

9           MR. GENECIN:  Your Honor, I would suggest the

10   following, that the touch base cases of the Second Circuit and

11   in this Court every one of them is not a case involving 1782.

12   And that is an understandable thing.  Every one of them is a

13   case in which the Court in discovery proceedings was asked to

14   decide whose privilege law applied to discovery to the

15   admission of exhibits.

16          THE COURT:  So there's no Choice of Law issue in the

17   case, is that what you're saying?

18          MR. GENECIN:  I'm saying yes.  I am saying that

19   whether you look at this as -- I'm suggesting that really this

20   is an issue that ought properly 1782 that really calls out

21   where there are privilege issues for consideration of the

22   privilege in the nation that is presiding the tribunal before

23   which the discovery is to be --

24          THE COURT:  We'll that's a Choice of Law issue at

25   least, would you not agree?

1          MR. GENECIN:  I would agree that would be --

2          THE COURT:  OK.  That was the question I asked you.

3     So there's a question here of what Jurisdictions law applies to

4     material generated for the AMS action, the law of the Kingdom

5     of Spain or the law of the jurisdiction where the action was

6     pending?

7          MR. GENECIN:  Well, the material was not simply

8     generated for the AMS action.  From the initiation of the

9     attorney/client relationship between Spain and Mr. Serrano at

10    Holland & Knight, the relationship was clearly about the

11    development of evidence for both cases.  It was clearly about

12    the development of evidence and then the litigation of the ABS

13    action in New York and it was about the development of evidence

14    for the Spanish proceedings and assistance with respect to

15    witnesses, with respect to expert testimony, with respect to

16    the other kinds of information needed for the Spanish

17    proceeding.  So that in the case of any particular item, if one

18    were to conduct the kind of scrutiny that Judge Engelmayer did

19    in the O'Kean case -- and I would emphasize that Judge

20    Engelmayer did not conduct that scrutiny until he had

21    determined that all of the mandatory and all of the other

22    discretionary factors in 1782 had been met so that it was

23    necessary for him to get into the whole question of what these

24    documents were.  But it's very clear that any given document

25    may have importance only to New York or importance only to

1    Spain or importance to both.

2              THE COURT:  Well, is that the standard?

3              MR. GENECIN:  Well, I would suggest to -- I'll tell

4    you why it's not the standard.

5              THE COURT:  OK.  Well, I didn't think it was but

6    that's why I asked you the question.  You've answered it.  I

7    didn't think it was the standard.  You don't have to go any

8    further.

9              MR. GENECIN:  All right.  It's not.  And thing the

10   that's worthy of emphasis here is that Spanish Professional

11   Secrecy covers the information that is in the hands of law

12   firms.  It covers the information that in the hands of

13   Dr. Cushing.  And the revelation of that information in 1782

14   proceedings would be a violation, as both deputy directors have

15   said in their submissions to your Honor and as Professor Ortiz

16   has said, it would be a violation of Spanish Professional

17   Secrecy, so that it's important to consider what would happen

18   here if this information were actually provided to the

19   applicant in supposedly for use in a Querella Criminal.  The

20   applicant, I mean I think it bears emphasis that what

21   Ms. Docampo said and has said over and over again about a

22   Querella Criminal is that she dare not bring one.  She doesn't

23   have a basis for it.

24             And a Querella Criminal, your Honor, has been made

25   clear on the submissions is brought in the form of a pleading.

1    It is presented not to a prosecutor but to an examining

2    magistrate.  The Spanish state is present in the form refers to

3    the prosecutor in connection with any Querella Criminal

4    proceedings that move forward.  There's an initial

5    determination made which is upon the four corners of the

6    complaint is a crime alleged?  If so, the examining magistrate

7    is empowered to seek evidence to support the allegations and

8    empowered also to seek evidence from the defendants who, by the

9    way, under Spanish procedure will testify in the course of the

10   proceedings before the examining magistrate.

11           THE COURT:  I could have misunderstood this, but I was

12   under the impression that the Querella Criminal had not been

13   submitted, had not been drafted.

14           MR. GENECIN:  There is no Querella Criminal that's

15   been drafted.  It has not been submitted.  There isn't one

16   because as Ms. Docampo says in her declarations to your Honor

17   they don't dare do it.  They don't dare do it because they

18   don't have a basis for alleging anything that would be

19   criminal.

20           THE COURT:  So how do you deal with the circuit's

21   decision in Mees then?

22           MR. GENECIN:  Well, Mees is, among other things, Mees

23   is a case that involves Dutch civil proceedings.  What we're

24   talking about is a different kind of proceeding.  The issue in

25   1782 is always and certain funds I think so this case that's

HAIAAINRA                    Oral Argument

1    very important here, certain funds makes it very clear.  The

2    question is does the applicant have a discernible procedure

3    avenue to bring the information that he obtains before the

4    court that he says he's going to?  Well, in the case of the

5    European Court of Human Rights it's very clear, Mr. Tisdale has

6    said he has got an Article VI complaint.  The European Court of

7    Human Rights is very clear on Article VI that it takes -- so

8    there is no avenue to present any new evidence to the European

9    Court of Human Rights.

10            By the same token in the case of the Querella Criminal

11    there is in the first place Spanish counsel inhibitions about

12    bringing one but assuming.

13            THE COURT:  I didn't hear what you said.

14            MR. GENECIN:  I said there are Spanish counsel's

15    inhibitions about bringing one.  She doesn't believe that

16    there's really a plausible case that she can allege now, and

17    that's what they said in her declarations.  But assuming for a

18    moment that a Querella Criminal could be brought and that a

19    Querella Criminal could be framed in this case so that the

20    examining magistrate would go into it and examine it, the

21    examining magistrate has the power to order the Spanish state

22    to produce these documents.  The Spanish state could turn to

23    Squire, could turn to Dr. Cushing and say, send it over.

24            THE COURT:  How do you establish that Dr. Cushing had

25    data in his files that were not produced if you don't know

HAIAAINRA                    Oral Argument

1   whether he had data in his files, if you surmise or infer that

2   he had data, must have had date but you don't know?

3          MR. GENECIN:  One of the things --

4          THE COURT:  Why don't you answer my question.

5          MR. GENECIN:  OK.  The allegation here that's been

6   made to your Honor -- by the way, there is no suggestion in the

7   papers, I don't think, that there is any Querella Criminal with

8   regard to Dr. Cushing or that the evidence is sought from

9   Dr. Cushing anything other than the European Court of Human

10  Rights.

11         THE COURT:  I agree.

12         MR. GENECIN:  The problem here is if the Spanish state

13  in its discovery practice before the courts of Spain failed to

14  produce data that Dr. Cushing had that the defendants, that

15  Mr. Mangouras for example was entitled to during the trial,

16  that was not an objection that was made in Spain during that

17  trial.  What is going on here is an exercise in failure to make

18  the necessary applications to the Court that is conducting the

19  trial and then coming here and saying, your Honor, you should

20  give it to us even though we didn't ask the Court that had

21  jurisdiction the Court that was hearing the case.

22         THE COURT:  How do you establish reckless contempt of

23  the truth by Captain Kostazos without the underlying

24  documentation and the statements that he made in his first,

25  that he made to counsel that gave rise to the first

1   declaration?  How do we know that the lawyers didn't distort

2   his truthful statements?

3           MR. GENECIN:  He was cross-examined extensively in the

4   proceedings in La Coruna about his statements to counsel in New

5   York who prepared the affidavits that were submitted in

6   connection with the New York proceedings.

7           THE COURT:  And he was allowed to answer those

8   questions?

9           MR. GENECIN:  He was allowed to answer those

10  questions.

11          THE COURT:  You are not going to claim any privilege

12  or secrecy then I take it?

13          MR. GENECIN:  He was asked about the circumstances in

14  which he made a statement.  This was during the time that this

15  testimony was being taken Mr. Starer was in the courtroom in

16  Spain.

17          THE COURT:  No.  You are not going to assert in this

18  proceeding that there's any confidentiality between Captain

19  Kostazos and the lawyer who prepared the declaration, I take

20  it?

21          MR. GENECIN:  Captain Kostazos was always a witness.

22  The issue is work product.  The issue is not a confidential

23  relationship.  So it's a work product issue, not an

24  attorney/client privilege issue.

25          THE COURT:  Well, it may not be privilege but if and

HAIAAINRA                    Oral Argument

1    to the extent that he is described what he told the lawyer in

2    order to prepare the declaration, you are not going to claim

3    that that is work product that you have protected with

4    confidentiality, I take it.

5             MR. GENECIN:  I would suggest that any drafts of that

6    to the extent that they exist, are work product.  He was

7    cross-examined about his statement that he actually swore to,

8    and he was cross-examined about whether that was true or not.

9             THE COURT:  Go ahead.  I thought you had said that in

10   the testimony he was asked about his communications with the

11   lawyer who drafted the declaration.  Did I miss hear you?

12            MR. GENECIN:  He was asked about how he was asked

13   about the preparation of the declaration and whether the

14   contents of the declaration were true.  And I think there is

15   actually in I believe it's in the 2013 papers we reproduced

16   some of the transcript of his actual testimony on that.

17            THE COURT:  I'm just saying I thought I understood you

18   to say just a few minutes ago that he testified as to his

19   conversations with counsel who prepared the declaration about

20   the preparation of the declaration.

21            MR. GENECIN:  Perhaps I misspoke then.  I'm not sure I

22   described that clearly.  I have only my recollection of the

23   record to go on.

24            THE COURT:  OK.

25            MR. GENECIN:  Let me emphasize something which is very

HAIAAINRA                          Oral Argument

1    important and it's in the papers that have been presented to

2    you by Dr. Serrano and by Professor Ortiz and also by Javier

3    Suarez who was the state attorney in Spain who actually

4    prosecuted the case in La Coruna, and that is the issue of

5    relevance.  And relevance is an issue that certain funds

6    teaches is part of what the Court needs to consider in terms

7    because, obviously, evidence can't be used if it isn't

8    relevant.  And it's important to note here and I have

9    referenced for example, because it appears in a number of

10   different places in our papers but in document 37-2 which is

11   the declaration of Professor Ortiz at paragraph 29, there is

12   discussion of the question of what the testimony was and what

13   the holdings of the Court in La Coruna were.  And it's

14   important in there context to remember that a Querella Criminal

15   cannot be predicated upon the concept that someone gave false

16   testimony in any other country except in Spain.  The Querella

17   Criminal is predicated exclusively upon the notion of perjury

18   before a Spanish court.

19        So what must be focused on is the testimony of

20   Mr. Kostazos, Mr. Alevizos, Mr. Thuesen and, specifically,

21   whether that testimony was material in any way to the

22   conviction of Captain Mangouras.  And it's clear here that

23   those gentlemen testified concerning issues having to do with

24   the captain's knowledge or foreknowledge of the condition of

25   the Prestige.  And that the Court in Spain held very clearly

1    the Court in La Coruna and then the Court in Madrid, the

2    Supreme Court of Spain were very clear that the case was not

3    predicated upon Captain Mangouras's knowledge of the condition

4    of the ship.  So the thing that has been before your Honor

5    since 2013 which is the predicate for the original application

6    and predicate for this application which is that Captain

7    Mangouras knew the condition of the ship is just not in the

8    case.

9           THE COURT:  Who offered the testimony from Kostazos

10   and Alevizos and Thuesen?  Was that offered by the defendant?

11          MR. GENECIN:  Well, it was offered by the Spanish

12   state, yes, your Honor.

13          THE COURT:  And it was not material testimony; is that

14   your position?

15          MR. GENECIN:  It was testimony that the Court in its

16   ultimate decision -- this was a trial which the Court heard

17   which had 108 witnesses on a great many different issues and

18   there were a lot of different counts and the Court came to, the

19   Court first in La Coruna and the Supreme Court came to rest on

20   specific counts based upon the evidence that it concluded was

21   material.  And so both courts relied upon certain specific

22   behavior by Captain Mangouras that he undertook a crossing at a

23   time when he knew there was bad weather, that he undertook that

24   crossing having laden the ship with something like two thousand

25   gallons more fuel oil than are permitted under international

regulations, that he at the point in time where there was a

rupture in the hull he straightened the ship and filled it with

sea water.  The finding was that he was an experienced mariner

and therefore, the finding is that he should have known when he

filled the ship with water that it was going to break the hull,

he was going to break the ship in half.

THE COURT:  And you say that was a finding of both

courts?

MR. GENECIN:  Well, the only court that is allowed to

make findings is the Court in La Coruna.  And so the court, the

Supreme Court is required to use those findings only in

determining whether the conclusions of law that are derived

from La Coruna.  So those are the findings in La Coruna.  Those

are the findings on which the Supreme Court relied in finding

that Captain Mangouras was guilty.  So we are not in an area

where the issue of what Captain Mangouras knew about what was

underneath the water line is relevant to any of the proceedings

going forward.  Because the court in La Coruna gave its

judgment and it was in reliance upon those facts that the

Supreme Court came to different conclusions about the criminal

conduct that Captain Mangouras should be convicted of which is

a practice and that is followed by the courts of Spain and that

is considered to be just fine in terms of the European

Convention on Human Rights.  The issue is only where an

appellate court were to substitute its own fact finding for the

1    fact finding of the court below.

2              THE COURT:  All right.  I'm going to give our court

3    reporter a five or ten minute recess and then we'll pick up.

4              Thank you.

5              (Recess)

6              THE COURT:  You may be seated.

7              Whenever you are ready, Mr. Genecin.

8              MR. GENECIN:  Your Honor, I'm sorry.  We were waiting

9    in other room.  We didn't know you had come back.

10             THE COURT:  That's fine.

11             MR. GENECIN:  So I think it's important to focus for

12   just a moment on the procedure in a Spanish Querella Criminal.

13   What happens is the person who has a complaint frames that

14   complaint.  It's a pleading.  It is not a collection of

15   evidence.  It is simply a statement of what happened to that

16   person or how that person alleges that he or she was a victim

17   of a crime, presents that to the examining magistrate.  The

18   examining magistrate then makes the determination whether that

19   Querella Criminal should be investigated.  At that point the

20   examining magistrate has all of the tools of the Spanish courts

21   at his or her disposal to get into the facts and to make and to

22   issue appropriate process to anyone including to the Spanish

23   government to produce documents that are needed to produce

24   witnesses so that the case can be investigated.  A case is

25   investigated before and by the examining magistrate.

HAIAAINRA                          Oral Argument

1              So what is happening here is you have before you an

2     applicant whose Spanish lawyer says I can't frame an

3     appropriate Querella Criminal.  And so she's unable to come up

4     with what went wrong, with what happened, with why it is that

5     these witnesses somehow gave testimony that constituted

6     criminal acts.  And that being the case it's not that she lacks

7     evidence cause she doesn't need it.  It's that she's asking --

8              THE COURT:  Why doesn't she need it?

9              MR. GENECIN:  Because if she were able to state what

10    happened in a way that was a convincing presentation that false

11    testimony of a material nature was given in the trial resulting

12    in the conviction, the examining magistrate could then say, OK,

13    what are the ways available to me as an examining magistrate to

14    get under the testimony, get under the surface of it and

15    discovery what happened?  Was it given with knowledge that it

16    was false?  Was it given criminally recklessly?  What exactly

17    are the aspects of it?  And then could seek this evidence and

18    could, as Professor Ortiz points out and as Dr. Serrano points

19    out, could weigh the issue of professional secrecy against the

20    relevance for Spanish purposes and against the need for Spanish

21    purposes and make a determination.  In other words, it is the

22    Spanish court's deciding what the Spanish courts need in order

23    to go forward with the case.

24             THE COURT:  This sounds to me like Mees, that you

25    could have filed a complaint in the Dutch court but you didn't

1   have the goods.  You couldn't substantiate your complaint, to

2   quote the Court of Appeals.  So you needed discovery in order

3   to be able to substantiate your complaint and to have an

4   opportunity to present why your complaint should not be

5   dismissed.

6            MR. GENECIN:  As I understand Mees, Mees involved a --

7            THE COURT:  Defamation claim against the respondent.

8            MR. GENECIN:  Correct.

9            THE COURT:  But not one that had been filed.  It was

10  the attorney's investigation of the defamation claim and to

11  prepare for the prosecution of such claim.

12            MR. GENECIN:  And in that case there were several

13  issues.  One was that what -- and I don't know whether this

14  would have been relevant under Dutch law but what was not being

15  sought was evidence that was subject to a privilege underneath

16  U.S. or Dutch law.  And as I understand it, there's some

17  lengthy discussion in Mees of the fact that under Dutch law

18  there are very rigorous pleading and support of the pleadings

19  with evidence provisions as there are in some continental

20  systems where exhibits have to be attached to the complaint,

21  and other evidence of the bona fides of the complaint have to

22  be put in.

23            That is not the situation with the Spanish Querella.

24  In Spanish procedure it is the examining magistrate who

25  conducts the investigation, who decides the evidence that

1    anybody says to him is relevant and should be considered

2    decides whether that evidence should be sought.  And if so, has

3    all of the means at his disposal including 1782 if he needed it

4    in order to obtain that evidence.

5              So what's happening here is we're putting the cart

6    before the horse in terms of this is not a Mees case.  This is

7    a, we're talking about a different kind of proceeding in a

8    different nation.

9              THE COURT:  So it's a low threshold to get the

10   prosecutor to pursue a Querella complaint; is that correct,

11   sir?

12             MR. GENECIN:  Yes, your Honor.

13             THE COURT:  OK.

14             MR. GENECIN:  Yes, your Honor.

15             THE COURT:  All right.

16             MR. GENECIN:  Now --

17             THE COURT:  And is that found, the low threshold is

18   that found in your declarations that it's a low threshold?

19             MR. GENECIN:  In both, yes.

20             THE COURT:  Where do I find that?

21             MR. GENECIN:  That's in the discussion of the Querella

22   Criminal.  I believe it is in both of the Ortiz declarations

23   and that there is also --

24             THE COURT:  Maybe you could find me the support and I

25   will give you the opportunity to point it out.  So this would

1    be in the Walters supplemental declaration and is that where

2    I'd find it?

3              MR. GENECIN:  Yes.  In the "Waters".

4              THE COURT:  The "Waters".

5              MR. GENECIN:  Affidavit, which is document 37 and

6    specifically in 37-2.

7              THE COURT:  Hold one second please.

8              (Pause)

9              MR. GENECIN:  It's 37-2 and specifically, starting at

10   paragraph 76, your Honor.

11             THE COURT:  One second please.

12             MR. GENECIN:  Certainly.

13             (Pause)

14             THE COURT:  So if the facts allege would constitute a

15   crime then the prosecutor is required to pursue it.  Is that

16   the representation you're making?

17             MR. GENECIN:  That is my understanding, yes, your

18   Honor.  And the discussion in the Ortiz declaration begins at

19   paragraph 76.  I don't know in your Honor found that but

20   starting at page 29 is the page number on the Court's stamp at

21   the top of document 37-2.

22             THE COURT:  I did.

23             (Pause)

24             THE COURT:  In American law if I make an allegation I

25   have to have the facts.  They have to have been known to me and

1    investigated by me before I can put my signature on a pleading

2    asserting the facts.  Is there a similar type of requirement

3    imposed on the attorney filing a Querella action?

4            MR. GENECIN:  It is my understanding that there is not

5    and there is discussion of the issue of, the potential for

6    there to be a false complaint charge in the Ortiz declaration

7    starting at paragraph 88.  And so from 76 to 87 there is

8    discussion on the question of the fact that there is no need to

9    allege the facts and to prove the facts in presenting a

10   Querella.  Then starting at paragraph 88 there is discussion of

11   the fact --

12           THE COURT:  So you would say, if I allege the facts

13   that complaint will be pursued by the prosecutor who will get

14   to the documents that in this case said before me in this

15   application, the files of Squire Patton and Dr. Cushing's files

16   and they'll be reviewed by the prosecutor; that's what you're

17   representing?  And it's only if there's nothing in there then

18   the filer is subject to a criminal charge, right?  Is that what

19   happens then?

20           MR. GENECIN:  No, that is not exactly what I'm saying,

21   your Honor.  What I'm saying is this, that a person who

22   files -- and by the way, what is happening before you here is

23   that there are unsubstantiated allegations of perjury in the

24   Spanish proceedings.  That is exactly what is being presented

25   to your Honor is that there are all kinds of innuendos and

HAIAAINRA                      Oral Argument

1    suggestions.

2              THE COURT:  Well, wouldn't it be a smart idea if I'm

3    going to accuse somebody, if I believe somebody committed

4    perjury and I have a good faith belief for that but I'm not a

5    guarantor of that fact and if I'm wrong I'll be prosecuted,

6    wouldn't it be prudent for me to know the answer to the

7    question of whether my good faith belief is supported by

8    evidence before I file the charge which could result in my own

9    prosecution?

10             MR. GENECIN:  The place, your Honor, where I part

11   company with your hypothetical is in the phrase "and if I'm

12   wrong I'll be prosecuted" because as we have shown here, that's

13   not what would happen.  What is needed is a good faith basis

14   and a set of allegations.  Now, if on a good faith basis the

15   person filing the Querella doesn't have the ability to allege

16   that a crime was committed and here we have gone through the

17   fact that the testimony in question was not material to the

18   decision that the Court made, so on that ground alone the

19   examining magistrate could say, well, yeah, but there is know

20   materiality here.  You haven't shown me that.

21             But let's assume for the sake of argument that the

22   testimony had been material.  What is going on here is an

23   attempt to circumvent Spanish proof gathering restrictions.

24   And the Spanish courts place Mees at the disposal of examining

25   magistrates to look into cases.  These things happen in a

1    certain procedural order.  And what the applicant is doing is

2    saying, I should just be allowed to jump over this and instead

3    of filing my Querella and presenting my allegations, instead of

4    doing that, I should be allowed to come to a judge in New York

5    and present a set of allegations that are by the way, much more

6    intensive, definite and specific in the papers filed by counsel

7    here than they are in the declarations of Spanish counsel who

8    is very reticent about alleging that any perjury took place.

9    But what he is saying is allowed should be allowed to go to New

10   York and say it happens an --

11            THE COURT:  Can the lawyer be prosecuted?

12            MR. GENECIN:  No, your Honor.

13            THE COURT:  OK.

14            MR. GENECIN:  And so I'd also suggest that paragraph

15   91 of the Ortiz declaration goes specifically to the fact that

16   Mr. Mangouras would not be at risk of prosecution.  In other

17   words, he doesn't need this evidence to avoid prosecution.

18            THE COURT:  Just one second.  Let me go back over this

19   declaration again.

20            (Pause)

21            THE COURT:  What do you do with paragraph -- wait a

22   minute.  OK.  I think I have it.  I have my question answered.

23            Thank you.  Go ahead.

24            MR. GENECIN:  Thank you, your Honor.

25            And both Dr. Serrano and Professor Ortiz have made it

HAIAAINRA                          Oral Argument

1    clear in their submissions that the problem with the kind of

2    end run around the way that proof in a Querella is obtained in

3    Spain, that the problem with coming here and saying to your

4    Honor, we need these materials for a Querella and you know you

5    should decide the discoverability in this instead of having a

6    Spanish judge do it.  The problem with that in a case like this

7    which involves documents that are in the hands of Spain's

8    lawyers and Spain's expert is that producing would run afoul of

9    Spanish Professional Secrecy such that those documents, that

10   testimony would become inadmissible for any purpose.  And

11   Dr. Serrano in his reply letter from August 21 cites a case of

12   the Spanish courts.

13          In a moment I will have the paragraph for you.  That's

14   document 49-1, your Honor.

15          THE COURT:  What do you do with paragraph 12 of the

16   Rodriguez Docampo declaration, document 41 at paragraph 12 in

17   which he cites the Supreme Court judgment "The hypothetical

18   breach of professional secrecy could never lead to the

19   annulment of the evidence.  That annulment effect cannot be

20   raised in a breach of unethical duty but the established

21   violation of the right of defense."

22          MR. GENECIN:  There is discussion of that issue and

23   this is at paragraph 49 one.

24          THE COURT:  Exhibit A.

25          MR. GENECIN:  Yes, that is Exhibit A to the Waters

HAIAAINRA                        Oral Argument

1    declaration.

2            THE COURT:  Yes.

3            MR. GENECIN:  Document 49 and Dr. Ortiz discusses

4    constitutional court ruling 193 of 1987 at paragraph 13.

5    That's on page eight.

6            THE COURT:  Where on page eight?

7            MR. GENECIN:  It's page eight at the top.

8            THE COURT:  Oh, I see.

9            MR. GENECIN:  Page eight of 21.

10           THE COURT:  Which paragraph?

11           MR. GENECIN:  Paragraph 13, your Honor.

12           THE COURT:  Well, that seems to be distinguishing a

13   case that was decided by Docampo, a 1987 decision.  And I'm

14   referring to paragraph 12 in which he is citing to what appears

15   to be -- I could be wrong -- a 2009 decision, January 25, 2009.

16           MR. GENECIN:  Give me a moment, your Honor?

17           THE COURT:  Sure.  Take your time.

18           MR. GENECIN:  Because there is a discussion of that.

19           (Pause)

20           MR. GENECIN:  I cannot say that I'm conversant with

21   the citation forms and so it can take a moment to line them up.

22           THE COURT:  Sure.

23           (Pause)

24           MR. GENECIN:  Your Honor, I have reference to document

25   49 again but Exhibit B thereto and that's document 49-2 which

1    is Professor Ortiz's declaration at page 13 of 41, paragraph 18

2    in which the professor directly addresses --

3              THE COURT:  Paragraph 14 of 41, did you say?

4              MR. GENECIN:  Page 13 of 41, paragraph 18.

5              THE COURT:  Thank you.

6              (Pause)

7              MR. GENECIN:  He addresses directly paragraph 12.

8              THE COURT:  Thank you.

9              (Pause)

10             THE COURT:  Thank you.

11             MR. GENECIN:  And I would also suggest to your Honor

12   that paragraph 15 of the Serrano letter of August 21, 2017,

13   which appears at document 49-1, page nine of 21, paragraphs 15

14   and then 16.

15             THE COURT:  Thank you.

16             MR. GENECIN:  So as you can see, your Honor, the

17   documents obtained in violation of professional secrecy are not

18   admissible and the application here takes matters in the wrong

19   order.

20             Now, in terms of burden because I think we ought to

21   discuss just for a moment the issue of --

22             THE COURT:  So would the court in Spain be looking to

23   U.S. standards for secrecy as to communications between

24   witnesses and U.S. counsel in the ABS litigation?

25             MR. GENECIN:  The Court in Spain would consider all

1   relevant objections that were made to it concerning the

2   production of the documents.  And in view of the fact that

3   Spanish Professional Secrecy is broader in its protections than

4   the attorney/client privilege and work product doctrine, the

5   Spanish Court would certainly be looking to all relevant areas

6   of objection to the production of these documents and would be

7   able to determine whether those objections should prevent the

8   production of the documents or whether in fact they are so

9   needed under Spanish law that invasion of the privilege or

10  professional secrecy are warranted.

11          THE COURT:  I gather they would do that but the

12  question I'm asking you is would they apply U.S. law to the

13  communications between counsel and a fact witness in the ABS

14  case or would they apply Spanish law?

15          MR. GENECIN:  Look, your Honor, I'm not a Spanish

16  lawyer.  I can't really answer that.

17          THE COURT:  You don't know.  The answer may be Spanish

18  law may come back and turn on Rule 26 work product

19  considerations, right?

20          MR. GENECIN:  Well, Spanish law might or might not,

21  that's right.

22          THE COURT:  OK.  So you're not saying that there is

23  some overriding principle of Spanish law, that a Spanish court

24  doesn't care what U.S. work product law is or what the

25  standards were governing the communication in the U.S. at the

1    time it was made.  They'll only apply their own domestic law.

2    You not asserting that?

3            MR. GENECIN:  I don't know what exactly a Spanish

4    court would do, your Honor.  What I do know is that the scope

5    of professional secrecy is broader under Spanish law and is

6    constitutional in Spain.  And that the Spanish court will

7    decide whether and to what extent documents such as the ones

8    that are sought here could be produced in Spain if there were

9    to be a valid proceeding and if there are a lot of -- if there

10   were be a valid application.  So a Spanish court would

11   certainly be able to get them.  One of the things here that's

12   important is that --

13           THE COURT:  Well, slow this down.  Slow this down.  A

14   Spanish court would consider whether it could be produced

15   Spain; is that what you are asserting to me?

16           MR. GENECIN:  Well, it's in Spain that the proceeding

17   that we're talking about would be taking place.

18           THE COURT:  It certainly is but that's not the

19   question I'm focusing on.  Would not a Spanish court say, these

20   were communications that did not take place in Spain.  These

21   are documents not located in Spain.  These were communications

22   between a New York lawyer and a fact witness in connection with

23   litigation pending in New York and therefore, would not a

24   Spanish court honor U.S. law?  Or would a Spanish court say, I

25   don't care what the circumstances were or what the protections

1    were at the time of the communication, I'm applying Spanish

2    law?  I thought I understood you to say, you're not a Spanish

3    lawyer and you don't know.  And the Spanish court may very well

4    apply U.S. law to these communications.

5            MR. GENECIN:  It could, I would think I -- certainly

6    Spanish courts are able to apply customs analysis and the law

7    that they believe is applicable.

8            THE COURT:  All right.  And they do apply conflict

9    analysis?

10           MR. GENECIN:  As I understand it, they do.

11           THE COURT:  OK.  All right.  And there is nothing in

12   your submissions that a Spanish court would apply Spanish law

13   to the exclusion of U.S. law to communications in New York

14   between a New York member of the bar and a fact witness in

15   connection with litigation pending in New York?

16           MR. GENECIN:  Well, I think there is something in our

17   submissions that goes to that point, your Honor, which is that

18   as Dr. Ortiz has made clear in his letter.  Spanish

19   Professional Secrecy applies to the attorney/client

20   relationship where ever that attorney/client relationship might

21   be so that the fact that what we're talking about in this

22   situation is a lawyer in New York for Spain does not change the

23   fact that Spanish Professional Secrecy is applicable to that

24   relationship.

25           Now it may be that there would be an analysis after

HAIAAINRA                     Oral Argument

```
 1   Spanish Professional Secrecy by a Spanish court in the
 2   appropriate circumstances that would say yes.  But under our
 3   rules there is a justification for requiring the production of
 4   these documents.
 5             THE COURT:  Why wouldn't the Spanish court honor U.S.
 6   law?
 7             MR. GENECIN:  At that point then the question would
 8   be, are these documents also protected under U.S. law?  And are
 9   there reasons why the Spanish court should honor U.S. law?
10             THE COURT:  Now I hear you saying the Spanish court
11   will apply Spanish law, not U.S. law --
12             MR. GENECIN:  As I understand --
13             THE COURT:  -- which is different than what I
14   understood you to say a few minutes ago.
15             MR. GENECIN:  Well, your Honor, I think that the
16   problem here is that we're going down the path of talking about
17   what Spanish law would do, what Spanish judges would do.  And I
18   would suggest that that's not really a concern here.
19             THE COURT:  I thought that was the path you were going
20   down, that it doesn't matter.  You should not order this
21   produced because a Spanish court and a Spanish prosecutor won't
22   consider it because it violates Spanish Professional Secrecy
23   law.  I thought that's where you were headed.
24             MR. GENECIN:  That is where I'm headed exactly there.
25             THE COURT:  Now I'm questioning you about that
```

1  assertion.

2        MR. GENECIN:  Well, we're talking about a different

3  proceeding.  In the first instance if your Honor were to order

4  this discovery --

5        THE COURT:  Yes.

6        MR. GENECIN:  -- that order would violate Spanish

7  Professional Secrecy and that would be the problem.  The

8  evidence would then be tainted by the violation of Spanish

9  Professional Secrecy.

10        THE COURT:  That would only be if Spanish Professional

11  Secrecy law applies to communications between a New York lawyer

12  and a nonparty witness in U.S. litigation.  And I have a

13  transcript here but I could have sworn I heard you say minutes

14  ago that you don't know whether or not the Spanish court would

15  apply U.S. law.

16        Now, I hear you saying quite emphatically that they

17  would not apply U.S. law.  They would apply Spanish law.

18  Spanish law is very forgiving.  There may be some reason why

19  they would consider it but they would not be applying U.S. law.

20  They would be a applying Spanish law.  And that sounds quite

21  different than what you asserted to me before which is you

22  don't know.

23        MR. GENECIN:  Well, perhaps, I wasn't clear.  I

24  thought that your questions related to what would happen in

25  Spain in the event that the Spanish examining magistrate --

1   with an appropriate Querella Criminal were seeking evidence,

2   seeking this evidence that Spain's New York lawyers have and

3   what objections the Spanish court would entertain under those

4   circumstances.

5            THE COURT:  No, that wasn't my question.

6            MR. GENECIN:  OK.  Well, I'm sorry.

7            THE COURT:  I was reacting to the argument you

8   advanced to me.  And the argument you advanced to me to repeat

9   it once again is that granting this application is of no import

10  because if granted and evidence were uncovered it would not be

11  considered in Spain because Spain would apply Spanish law, not

12  U.S. law to communications between a New York lawyer and a

13  nonparty witness concerning New York litigation.  And I think I

14  got two answers from to you that question.  One, I don't know

15  and the other, yes, they would apply Spanish law.

16            MR. GENECIN:  If your Honor would look at the Serrano

17  letter again annexed to document 37-1 at paragraph 12 --

18            THE COURT:  On what page, please?

19            MR. GENECIN:  It's document 37-1 which is --

20            THE COURT:  I know what it is.

21            MR. GENECIN:  Sorry.  And it is paragraph 12 which is

22  page five of six.

23            THE COURT:  I've read it.

24            MR. GENECIN:  So Spanish privilege law at this

25  point -- and forgive me if I misunderstood the question.  I

1    guess I wasn't clear in my response but the problem that

2    Dr. Serrano has made clear in his letter to your Honor of

3    August 21, the problem that Professor Ortiz has illustrated at

4    greater length in his submissions is that obtaining this

5    evidence directly from us, from the respondents here in New

6    York would violate Spanish Professional Secrecy and taint the

7    evidence so that it could not be used and would put the cart

8    before the horse in terms of the Spanish proceedings in which a

9    Spanish examining magistrate could make the necessary

10   determination and order the Spanish government which everybody

11   agrees is the owner of this evidence --

12           THE COURT:  I think that's exactly correct because

13   what I read in the declaration is that if the Spanish

14   government owned it then there would be an obligation to make

15   it available if they owned it, a point that was disputed.

16           MR. GENECIN:  I'm not sure I'm following you.

17           THE COURT:  Well, I read this in one of the

18   declarations submitted by the applicant that if the Spanish

19   government owned the documents, then they would have had an

20   obligation to turn it over and produce it but they didn't.

21           MR. GENECIN:  That was a kind of an interesting

22   discussion in the applicant's documents.  The applicant was

23   referring to what we would think of as Freedom of Information

24   law.  The applicant was referring to the concept that there are

25   certain kinds of public documents of the government that in

1    fact the government is required to make available upon

2    application, just as the government is obligated to produce

3    documents to members of the public here under Freedom of

4    Information Act.

5              But there is discussion by both Dr. Ortiz and by --

6    sorry -- by both Professor Ortiz and by Dr. Serrano of the fact

7    of this Freedom of Information assertion by Ms. Docampo is not

8    at all a posit in the case of litigation documents in the hands

9    either of the Spanish state attorney or of the lawyers for

10   Spain.

11             So we're not talking about a situation in which those

12   government documents would be freely available any more than

13   documents developed by the Justice Department here are

14   available to citizens under the Freedom of Information Act

15   here.

16             THE COURT:  All right.

17             MR. GENECIN:  So I would just for a moment and as I

18   indicated earlier, the issue of burdensomeness really only

19   needs to be addressed at such time as the Court were to decide

20   that the statutory requirements of 1782 had been met.

21             THE COURT:  Why don't you address it because I hope to

22   be able to rule on this.

23             MR. GENECIN:  Yes.  I am going to address it and I

24   think this is an issue that the O'Kean decision I think is

25   instructive.  The Court having decided that there were, that

1  1782 was otherwise valid, then went on to examine a certain

2  number of documents to figure out whether those documents were

3  subject as the Court determined to Russian/Ukrainian privileges

4  and went on to discuss the issue of burden.

5          And the documents at issue here are not limited to the

6  hard copy documents that your Honor -- and you will perhaps

7  recall this -- back in 2013 it was your view that it would be

8  easier for us as a preliminary matter to review the documents

9  that were in hard copy.  We did that.  And as your Honor

10  directed, we reported to you.  There was absolutely no

11  requirement by the Court that we provide a privilege log.  You

12  said we should hold off on doing that.  We then thereafter your

13  Honor dismissed the application so there was no basis at that

14  time for any privilege log to be produced.

15          THE COURT:  Because the Court said you need not

16  produce a privilege log.  What happened here?

17          MR. GENECIN:  Well, here --

18          THE COURT:  You didn't produce a privilege log?

19          MR. GENECIN:  We did not, your Honor.

20          THE COURT:  Why not?

21          MR. GENECIN:  In reliance upon the fact that what we

22  had was a repetition of the situation in the previous case.

23  The applicant came in asserting that the same proceedings that

24  he wound up with in 2013 and claiming that he had, he now had a

25  basis for bringing those admitting that he didn't have any

1  | basis for them in 2013.  But there was -- so it was our view

2  | that the production of any log should abide your Honor's

3  | decision about this.

4  |          And I would like to note here that what is involved is

5  | not simply the documents that were in paper copy.  What there

6  | are is I think about 1.3 million documents that are on a number

7  | of different computerized databases.  Some of them are on

8  | legacy systems for which we currently don't have a license.

9  | Some of them are on legacy systems for which we only have one

10 | license.  So only one person on one computer could even look at

11 | them.  There are documents in Spanish.  There are documents in

12 | Greek.  Those would all need to be translated in order to

13 | review them effectively.  We put a lot of resources over a very

14 | short time into the examination of the paper documents.  But I

15 | would suggest to your Honor that the burden here is not at all

16 | commensurate with the showing that applicant has made.

17 |          THE COURT:  What's the volume of the paper documents?

18 |          MR. GENECIN:  The volume of paper documents is

19 | approximately, I think the number is 1328 boxes, bankers boxes.

20 | And we have reviewed those boxes that based on our index we

21 | found the documents and we wrote to the Court that we had

22 | identified certain documents that we believe are privileged.

23 | What we haven't done about those documents is reviewed them

24 | further to make sure that none of them was, for example,

25 | forwarded to somebody outside of counsel so that they actually

1    should come off the privilege log and we make that clear.

2              THE COURT:  How many such documents that you determine

3    based on your review of the index to the 1300 boxes were

4    potentially relevant to the subpoenas in hard copy?

5              MR. GENECIN:  In hard copy we identified approximately

6    300 documents that we thought were potentially responsive.  Of

7    them we identified 104 that we have tentatively logged as

8    privileged.

9              THE COURT:  Thank you.

10             MR. GENECIN:  That does not count the enormous volume

11   of electronic documents.

12             THE COURT:  Thank you.

13             MR. GENECIN:  Thank you, your Honor.

14             THE COURT:  All right.  Mr. Tisdale.

15             MR. TISDALE:  I hope just a few points, your Honor.

16   Your Honor asked for or a point was made about the Touch Base

17   Analysis, the conflict of law being, not being utilized in any

18   1728 applications.  In fact it's specifically used in In Re:

19   O'Kean and that was a 1782 application.  That was a case

20   pointed out by counsel.  It's 12 -- it's actually 12

21   Miscellaneous 104, Judge Engelmayer.  I cite to it on page two

22   of my reply memorandum.

23             THE COURT:  One second now.  You'll have to forgive

24   me.  There are quite a few memos and they have various names.

25   OK.  What page of your reply?

1            MR. TISDALE:  I can give you the specific citation,

2       judge.  There is no official citation or unofficial citation.

3            THE COURT:  What's the name of the case?

4            MR. TISDALE:  In Re: Application of O'Kean, O-K-E-A-N,

5       B-V it's actually a case first cited by respondents and it's

6       12 --

7            THE COURT:  I'm looking at your table of cases on the

8       reply memo.

9            MR. TISDALE:  OK.  If you look at page two of my reply

10      memo you'll see it there.

11           THE COURT:  One second.  Now I have it but this is

12      what I don't understand.  A miscellaneous cite is a cite to a

13      New York State court.  So that's why I'm pausing on this

14      because Judge Engelmayer doesn't sit in New York Supreme.

15           MR. TISDALE:  No, he certainly does not.  There is no

16      reported decision.

17           THE COURT:  So what does this mean "12 Miscellaneous

18      104"?

19           MR. TISDALE:  It's a 2012 miscellaneous case in this

20      court.

21           THE COURT:  I see.  It's the docket.

22           MR. TISDALE:  That is the docket entry of his order

23      which was a transcript.

24           THE COURT:  OK.  Now I got it.

25           MR. TISDALE:  But it's Judge Engelmayer for instance

1  who goes through the Touch Base Analysis in a 1782 application

2  to determine whether Foreign Privilege law or U.S. Privilege

3  law applies in a 1782 application.

4         Now, just as another point about Spanish Secrecy Law,

5  couple of points on Spanish Secrecy Law.  If it is -- you'll

6  see throughout the Docampo declaration, as well as the Ruiz

7  Soroa declarations, there are numerous references to the fact

8  that the Spanish Secrecy Law only applies to those things which

9  are provided by the client.  They only relate to

10  attorney/client privilege.  They do not have this broad based

11  application that respondents are pursuing.  But even if it did

12  have that kind of application, what I'm hearing here is you

13  can't have it here in the United States based upon our secrecy

14  law.  But if you bring a Querella Criminal, the magistrate

15  there can get it.  You can get it in Spain because it's not so

16  secret in Spain.  It's only secret here in the United States.

17  That to me is a blocking statute.  That's not a privacy

18  statute.  That's a blocking statute.  And this Court has said

19  on a number of occasions that blocking statutes are not and

20  should not be enforced.

21         Now, there was a discussion about the case Certain

22  Funds.  In that case, your Honor, in Certain Funds that was the

23  case where the Court found that there was not sufficient

24  evidence submitted to show the reasonable contemplation of a

25  future action.  In that case the only evidence submitted was

1   the applicant himself and his U.S. lawyers.

2           The difference between Mees which was a month prior

3   and Certain Funds --

4           THE COURT:  Both written by Judge Lynch, I believe.

5           MR. TISDALE:  Correct.  Within a month of one another

6   as a matter of fact.  Was that in Mees it was based upon the

7   affidavits of foreign counsel who were preparing those foreign

8   proceedings as is the case here where your Honor has three

9   different lawyers addressing the fact that a Querella Criminal

10  will be prepared if the equitability filed, if the evidence

11  provides the full basis for it.

12          Questions were raised as to the relevance of the

13  evidence in these different cases.  Judge, that specifically

14  what the European Court of Human Rights and Querella Criminal

15  court should ultimately determine.  But the question of what

16  Ms. Docampo said in her declaration, what Ms. Docampo is saying

17  is that we have a very strong belief that these people

18  knowingly or recklessly lied in Spanish court.  But it would

19  not be proper to file that complaint and it could in her belief

20  based upon the cases which she cites, could expose Captain

21  Mangouras to being prosecuted for pursuing a false claim.

22          Now, whether or not it needs to be part of the

23  pleading and needs to be provided by her in the Querella

24  Criminal pleading, she specifically cites to a case at page 13

25  of her declaration, paragraph 32, where she says:

HAIAAINRA                    Oral Argument

1          "Even if in the initial pleading sufficient facts are

2      pled, if no evidence is provided in the case to provide

3      reasonable assurance of its truthfulness, the Querella Criminal

4      may be found inadmissible."

5          And she cites two Supreme Court decisions from 2012 to

6      support that comment.

7          The comment about none of this being relevant because

8      the Supreme Court did not say that the captain knowingly sailed

9      with a structurally defective vessel, what the Court found was

10     that the vessel was structurally defective.  And all of the

11     evidence that we seek relates specifically to those

12     allegations.  The testimony of Thuesen, the testimony of

13     Kostazos, the testimony of Alevizos, all relate to the

14     structural condition of the vessel.  The evidence we seek from

15     Dr. Cushing all relates to the substance of the structural

16     integrity of the vessel.  That was part and parcel of the

17     Supreme Court's findings.

18         You asked about Captain Kostazos's declaration and

19     preparation of his declaration.  During his testimony in Spain

20     he mentioned on a number of occasions, where is my Greek

21     version?  And he went on to say that the declaration was not

22     properly prepared in accordance with his instructions.  So the

23     physical preparation and exchange of information with Captain

24     Kostazos and all that is very relevant to the Querella Criminal

25     or the potential European Court of Human Rights based upon what

1    is the background of that information that was exchanged with

2    him.  How is it exchanged?

3           Now, whether or not the Querella Criminal magistrate

4    can get this information from Spain again, it seems to me that

5    that somehow or other undermines this whole Spanish Secrecy

6    argument that he can get it but we can't, that he won't get it

7    in the investigation phase.  He won't get it in our pleading

8    phase.  He'll get it only after we plead.  If we don't properly

9    plead it, he'll reject it.  We need it for the pleading phase

10   and we need it to support it.

11          THE COURT:  All right.  Let me ask you to address the

12   following:

13          The argument has been advanced that the Kostazos

14   declaration, the Thuesen testimony, the Alevizos testimony, is

15   utterly irrelevant to your petition to the European Court of

16   Human Rights and it's utterly irrelevant to any Querella

17   Criminal because your client was not convicted in any way,

18   shape or form based on the condition of the vessel or as I

19   think I heard it described, as what happened below what he knew

20   about, what happened below the waterline.  I think that's the

21   way it was phrased.  I'm not an admiralty guy.  Is that the

22   case and doesn't that doom your application?

23          MR. TISDALE:  No and no.  Number one, the Supreme

24   Court of Spain, specifically, held that the vessel that Captain

25   Kostazos was neglect for leaving in those weather conditions --

HAIAAINRA                    Oral Argument

1            THE COURT:  Not Kostazos.

2            MR. TISDALE:  I'm sorry.  "Captain Mangouras".

3            THE COURT:  Right.

4            MR. TISDALE:  Captain Mangouras was grossly negligent

5    or leaving in that weather knowing the potential weather in the

6    North Atlantic in those loaded conditions with the struct --

7    with the depreciated or deficient structure of the vessel as it

8    existed.  There is no prior -- so whether or not the vessel was

9    structurally deficient or not is crucial to his conviction.

10            THE COURT:  Where do I find a translation of the

11   decision of the Supreme Court?

12            MR. TISDALE:  I believe that is one of the -- it's

13   appended to my declaration.

14            THE COURT:  Let's get to the bottom of that.  There

15   was a flatout assertion made here today and either,

16   Mr. Tisdale, you're mistaken or respondent's counsel is

17   mistaken but I'd like to know the answer to that.

18            MR. TISDALE:  Yes.  Your Honor, I believe we have the

19   decision of the Supreme Court submitted to your Honor.  I don't

20   have it with me.

21            THE COURT:  All right.

22            MR. TISDALE:  If I can suggest we write your Honor

23   tomorrow with those sections which talk about the structure of

24   the vessel and its significance.

25            Moreover, your Honor, it is not a requirement for the

HAIAAINRA                    Oral Argument

1   Querella Criminal that that evidence be crucial to his

2   conviction.  It just has to be alive.

3        THE COURT:  Maybe opposing counsel can be of help on

4   this.

5        Mr. Genecin, have you been able to find it?

6        MR. GENECIN:  Yes, your Honor.  If I may, and I'm

7   sitting just because I'm consulting here but --

8        THE COURT:  That's fine.

9        MR. GENECIN:  It's Exhibit 37, Exhibit D to Document

10   37 which is the Waters affidavit.  I'm sorry.  Yes, Exhibit D

11   is the English version of the judgment of the Supreme Court of

12   Spain.  And so --

13        THE COURT:  Well, let's see here.

14        MR. GENECIN:  So it's labeled Exhibit 39, your Honor.

15        THE COURT:  Oh, I have it.  I'm looking at it right

16   now.

17        MR. GENECIN:  Good.

18        THE COURT:  The structural failure -- this is 37-9,

19   page eight of 133.  The structural failure was due to deficient

20   maintenance and upkeep that was unnoticed by and hidden from

21   those aboard the ship commanding it or carrying out any other

22   duty.

23        MR. TISDALE:  So all of the evidence we seek, your

24   Honor, relates to that allegation that the vessel was of a

25   deficient condition, not whether the captain knew it whether or

HAIAAINRA                      Oral Argument

1  not he knew it is not the point to the Court's findings because

2  that's a different finding than the first instance Court made.

3            THE COURT:  Well, what has been asserted here and it's

4  a matter of some importance.  I'm happy to hand you the

5  document.  I don't know how long it is.  It seems to be quite

6  long.

7            MR. TISDALE:  May I, your Honor?

8            THE COURT:  Yes, go ahead.

9            MR. TISDALE:  The problem with my looking at that one

10 is we're all working off of different translations, not that

11 the translations are different but the information is found on

12 different pages.  I wouldn't know where to begin.

13            THE COURT:  All right.

14            MR. TISDALE:  But the point your Honor just made in

15 one being one of them, the Court the Supreme Court found that

16 the vessel of a deficient condition.

17            THE COURT:  But at least what I did read indicated in

18 that -- this is a lengthy document, so nobody should put too

19 much weight in the fact that I read one sentence out of who

20 knows how many pages here.  But that seemed to suggest that the

21 crew aboard did not know of the deficient condition.  And I

22 guess what I'm getting at is how was your client's knowledge of

23 the condition a factor in his conviction?  Because if it wasn't

24 a factor in his conviction, how does it do you any good in your

25 Querella Criminal or the European Court of Human Rights?

HAIAAINRA                          Oral Argument

1          MR. TISDALE:  First, insofar as the Querella Criminal

2     is concerned, that has to do solely with whether the witnesses

3     gave false testimony in a court, in a Spanish court.  It does

4     not have to be specifically connected to the decision of the

5     Supreme Court of Spain.  It's strictly a matter of, did you

6     provide false evidence much like providing false evidence?

7          THE COURT:  So, in other words, if the Supreme Court

8     had affirmed the court of first instance you're right to bring

9     a Querella Criminal complaint would remain undisturbed?

10          MR. TISDALE:  Correct.

11          THE COURT:  OK.  And I'm going to find that where in

12     your papers?

13          MR. TISDALE:  I don't know, judge.

14          THE COURT:  OK.

15          MR. TISDALE:  At the moment, I don't know.  I don't

16     think anybody has ever said that it had to be specifically

17     connected to it.

18          THE COURT:  OK.

19          MR. TISDALE:  The second part is I can represent to

20     your Honor that the finding that the structural condition, that

21     the vessel was in a structurally deficient condition is in fact

22     part of the submission to the European court of Human Rights,

23     that that finding by the Supreme Court which is contrary to the

24     finding of first instance court is one of the grounds

25     specifically at the European Court of Human Rights.

HAIAAINRA                    Oral Argument

1          Moreover, this issue of whether or not we had all o

2     the information in order to prove that the vessel was in fact

3     not in a deficient state, that Dr. Cushing we believe has or

4     that evidence may support that the vessel was not in a

5     deficient condition, that that is part of that Article VI

6     Equality of Arms argument to the European Court of Human

7     Rights.

8          Now there was some discussion about the fact that this

9     evidence will not be admissible in the court because it

10    violates Spanish Secrecy Law.  As your Honor pointed out,

11    Ms. Docampo specifically addresses that with citations, two

12    Supreme Court cases, there is dispute between the two experts.

13    And I think that that is exactly what the courts in Europa Misa

14    says.  You're not supposed to get involved in.  We just can't.

15    We're not Spanish law experts.  We're not.  And your Honor

16    shouldn't be asking to be put in that position of being a

17    Spanish law expert.  The documents should be produced it should

18    be left to the Court to decide.  We have contrary Supreme Court

19    support for the fact that this evidence will be admissible.

20    But nonetheless, admissibility in a foreign court is not the

21    test of 1782.  Can the information be used?  And the

22    information will be used in drafting the Querella Criminal and

23    in pursuing the European Court of Human Rights applications.

24    That's Mees and.  That's Hornbook in this circuit.

25          This idea that we need to pursue it first in Spain

1   through the Querella Criminal prosecution, that's exactly what

2   Mees says we don't have to do.  We don't have to show that we

3   have a need for this information to present and that would be

4   as the Mees court says that would undermine the Court's rulings

5   Intel.

6           As for the burdensomeness, the only thing I would

7   suggest to your Honor is we have two very good IT consultants

8   that we used.  We are very pleased to assist in any way we can

9   in the searching of this electronic information.

10          THE COURT:  Thank you.

11          MR. TISDALE:  Thank you.

12          THE COURT:  All right.  This is what I'm going to do.

13  I'm going to require that the paper documents, the 104 paper

14  documents as to which there is an assertion of a privilege, be

15  logged and that the log be produced.  We're only talking about

16  104 documents.

17          MR. TISDALE:  Your Honor, I believe it exists.  The

18  log as been prepped.

19          THE COURT:  Oh, it has been prepared already; is that

20  correct?

21          MR. TISDALE:  In 2013.

22          THE COURT:  Mr. Genecin, was the log prepared in 2013?

23          MR. GENECIN:  We have a draft log, your Honor, yes.

24          THE COURT:  So why don't you finalize that and produce

25  it to opposing counsel by October 27 and I will give

HAIAAINRA                         Oral Argument

1   Mr. Tisdale until November 1 to designate 20 documents from the

2   log, make it ten documents from the log and they're to be

3   produced to me in camera by November 3, close of business.

4          Beyond that I want to thank counsel for their

5   presentations in this case.  The issues are very interesting

6   and I know both sides and their associate counsel have worked

7   very hard on this matter and that's where I am as after now,

8   and you will hear from me at some point.

9          Thank you.

10                         (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25